RICHMOND AMERICAN HOMES OF COLORADO, INC.; Metropolitan Development IV, LLC; Metropolitan Builders, Inc.; Standard Pacific of Colorado, Inc.; and Touchstone Homes, LLC, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. 05–280C.

United States Court of Federal Claims.

March 11, 2008.

Hubert A. Farbes, Jr., Denver, CO, for Plaintiffs. With him on the briefs were Mark J. Mathews and Michelle C. Kales.

Kyle Chadwick, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., for Defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General; and Jeanne E. Davidson, Director. David R. Vecera, U.S. Air Force, Arlington, VA, Of Counsel.

John Bergen, Law Clerk.

## OPINION

BASKIR, Judge.

The trial in this matter involves several claims for indemnification for environmental remediation and other related costs incurred by four homebuilding companies which developed property formerly owned by the U.S. Air Force. The four Plaintiffs are Richmond American Homes of Colorado, Inc. ("Richmond American"); Metropolitan Development, LLC and Metropolitan Builders, Inc. (collectively "Metropolitan"); Standard Pacific of Colorado, Inc. ("Standard Pacific"); and Touchstone Homes, LLC ("Touchstone"). The Plaintiffs seek indemnification pursuant to Section 330(a)(1) of the National Defense Authorization Act for Fiscal Year 1993, Pub.L. 102–484, 106 Stat. 2315, 2371, 10 U.S.C. § 2687 note ("Section 330"). Having previously found in favor of the Plaintiffs on the question of liability, *see Richmond American Homes of Colorado, Inc., et al. v. United States,* 75 Fed.Cl. 376 (2007) ("*Liability op.*"), we held trial on the quantum of damages.

After hearing the testimony of Plaintiffs' witnesses and carefully weighing all of the evidence presented at trial, we find that the Plaintiffs are entitled to reimbursement for direct costs and unabsorbed overhead, but not for legal fees or for historic indirect cost recovery (mark-up or profit). We, therefore, **GRANT** the Plaintiffs judgment as follows: **Richmond American,** in the amount of **$3,314,119; Metropolitan,** in the amount of **$552,888; Standard Pacific,** in the amount of **$2,287,848;** and **Touchstone Homes,** in the amount of **$409,821. We also DENY the Government's Motion for Reconsideration for the reasons set forth below.**

## BACKGROUND

A full recital of the facts of this case is set forth in this Court's opinion granting partial summary judgment to the Plaintiffs on the issue of liability. *See Liability op.* at 378–87. We refer to that background occasionally. We focus on those facts which are directly relevant to the issue of damages.

### I. Facts

Lowry Air Force Base, Colorado, operated as an active military installation from 1937 until it was selected for closure in 1991 pursuant to the Defense Base Closure and Realignment Act of 1990, Pub.L. No. 101–510, as amended, §§ 2901–11, 104 Stat. 1808, 10 U.S.C. § 2687 note ("Base Closure Act" or "BRAC"). In June 1995, Defendant sold 711 acres of the former base to the Lowry Redevelopment Authority ("LRA"), which purchased the property in order to improve the lots and convey them to various homebuilders, including the Plaintiffs. *Liability op.,* 75 Fed.Cl. at 378. The LRA is not a party to this action. However, it has filed a separate claim against the Government, which is currently pending before another judge of this Court. *Lowry Redevelopment Authority v. United States,* No. 06–75 (Wheeler, J.).

Each of the Plaintiffs in this consolidated suit purchased lots from the LRA in an area of Lowry known as the Northwest Neighborhood. They purchased their lots in a series of groupings or "filings" throughout the mid- to late–2002 time frame and began construction. Transcript ("Tr.") 32–35, 355–56, 393. These were "finished lots," meaning that all the infrastructure for residential development,

including streets, sewers, and utilities, was already in place for the home builders. Tr. 33–34, 356. Richmond American purchased 63 lots from the LRA. Tr. 32–33; *see also,* Map of Plaintiffs' Properties, Demonstrative Exhibit ("Dem.Ex.") B. Metropolitan purchased 52 lots. Tr. 255–56. Standard Pacific purchased a total of 80 lots, 71 in the Northwest Neighborhood. Tr. 157; Dem. Ex. B. And, finally, Touchstone bought only seven lots, which were scattered among seven different blocks of homes owned by the other builders. Tr. 393; Dem. Ex. B.

At the time of purchase, the builders had no reason to suspect the presence of asbestos or asbestos containing material (ACM) in the property's soil. *Liability op.* at 381–82; *see* Tr. at 160 ("We did no environmental investigation ... due to the FOST, the Finding of Suitability for Transfer, which provided that the lots were suitable for the intended end use; in this case, residential construction."). However, in April 2003, either the LRA or the Colorado Department of Health and the Environment (CDPHE) informally notified the Plaintiffs that regulators believed soil in the area could be contaminated with ACM. *Liability op.* at 383–84.

On April 24, 2003, the CDPHE issued a "Compliance Advisory" to the Plaintiffs, the LRA, and the Air Force, which cited 23 discoveries of asbestos contamination and required further investigation and remediation of ACM in the soil of their respective properties. *Id.* On April 30, 2003, the State issued a second Compliance Advisory, containing the same language, and requiring the Plaintiffs to create and implement an approved plan for indoor air sampling in finished homes that Plaintiffs had already constructed on the affected property. *Id.* The advisories warned of additional enforcement actions for failure to respond in a timely fashion. *Id.*

Although the Air Force chose not to accept the State's findings, both the LRA and the Plaintiffs immediately began negotiations with CDPHE due to the prospect of formal enforcement action and penalties. Despite Plaintiffs' objections, the State demanded that the soil be cleaned to a "non-detect" level. As we discussed in the liability opinion, the Government believed this to be an excessively stringent standard given the fact that asbestos is a threat only when airborne. *Liability op.* at 384. Although the Plaintiffs requested that the Air Force respond to the State on their behalf, there is no evidence that the Air Force provided any support. Tr. 110–11, 193–94, 379–80, 405.

Plaintiffs invoked Section 330 early in this process in order to compel the Air Force to either defend against the advisories or indemnify the builders for the mounting expenses. *Liability op.* at 384. The Air Force's initial response simply indicated that the developers were proceeding at their own financial risk by complying with CDPHE demands for soil cleaning to a non-detect level. *Id.*

On August 15, 2003, the final response plan was issued and agreed upon by the LRA and each of the Plaintiffs. It called for thorough sampling of every lot, and for two feet of soil to be removed in any area where ACM was found. *Id.* Due to their efforts to comply with the response plan, Plaintiffs collectively claim to have suffered in excess of $9 million, including costs associated with investigation and remediation, as well as homeowner expenses, unabsorbed overhead, other indirect costs and attorneys' fees.

Subsequent to the remediation, the Plaintiffs pursued a formal demand for indemnification of their costs under Section 330. We have previously described an extensive record of correspondence among the Plaintiffs and Air Force officials, DoD officials, and various elected representatives. *Liability op.* at 384. The Air Force legal office processed the claims and requested supporting documentation, never indicating that the Plaintiffs' claims would be rejected. On November 18, 2004, Mr. David Vecera of the Department of the Air Force Legal Services Agency responded to the claims of each Plaintiff in letters stating that the Section 330 claims would be addressed by the Office of the Secretary of Defense and that documentation provided by the Plaintiffs was being forwarded to the Office of the General Counsel, Department of Defense, for appropriate action. *Id.* After several months with no word from the Secretary of Defense, Plaintiffs filed suit here.

## II. Procedural History

The Plaintiffs' complaint seeks recovery under the statutory indemnification scheme provided by Section 330 (Count I), or, in the alternative, damages for breach of various deed covenants (Count II). In July 2006, the Plaintiffs filed a motion for summary judgment on both counts. The Government moved for dismissal or summary judgment on Count I only, arguing that the Plaintiffs did not qualify for indemnification because the costs for which they sought reimbursement did not stem from "any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage," under Section 330(a)(1).

On February 22, 2007, the Court issued its first opinion in this case and addressed liability of Defendant under Count I of the Plaintiffs' complaint. In that opinion, we granted the Plaintiffs' motion for summary judgment on the issue of liability, ruling that the Defendant was liable for the costs incurred by the builders as a result of the ACM that originated with the Air Force's prior ownership of the property. *See Liability op.*, at 399.

We concluded that the Defendant's narrow interpretation of Section 330, suggesting that it provided indemnification only for third-party judicially enforceable demands against the Plaintiffs, was inconsistent with the broad terms and statutory purpose of Section 330. *Id.* at 390–91. We found that the CDPHE Compliance Advisories, which required extensive investigation and remediation of the Lowry lots, constituted a "claim" for "property damage" within the meaning of the statute. *Id.* at 392–96. We further determined that the Defendant provided no evidence to support its defense of contributory responsibility. *Id.* at 396–98.

Although there existed no judicial opinions concerning this statute at the time we entered our liability findings, another judge of this Court has since issued an unpublished disposition in the BRAC/Section 330 context in *American International Specialty Lines Insurance Co. v. United States,* No. 05–1020C (Fed.Cl., Jan. 31, 2008) ("*AISLIC*"). The factual circumstances are substantially dissimilar to the present case and are not worth going into at this juncture. However, the legal issue is the same. The AISLIC Court expressly disagreed with our construction of the statute's indemnity provisions.

Articulating the very same arguments made by the Defendant in this case—we note that Government Counsel was the same in both proceedings—the Court found it unnecessary to consult the legislative backdrop of the indemnification scheme, and held that the plain language of Section 330 provides no cause of action absent a third party claim. *AISLIC,* slip op. at 34. According to the decision, "the indemnification claim made by the plaintiff, the Authority, and the City of Alameda to the Navy cannot be a 'claim for personal injury or property damage' because none of those entities is a third party." *Id.* at 34–35. The Court found that to hold otherwise "would render the 'settle and defend' language of Section 330© nonsensical." *Id.* at 35.

Citing the *AISLIC* Opinion, the Government has filed a Motion for Reconsideration. *See* Defendant's Motion for Reconsideration (Feb. 6, 2008) at 6–7 (Requesting the Court to revise summary judgment decision "to adopt the analysis of section 330 set forth in *AISLIC*" ... or "clarify, in a new order, the grounds for this Court's disagreement with *AISLIC* ...")*. We have, as noted, rejected the Government's arguments in our previous opinion, and while we respect the *AISLIC* Court's views, we see no need to revise ours. **Accordingly, we deny the Government's Motion for Reconsideration.**

The only issue that remains to be decided in this action is the quantum of damages incurred by the Plaintiffs as a result of the Compliance Advisories. We heard evidence on damages over the course of two days in late July 2007. The Plaintiffs presented 18 binders and over 79 exhibits, consisting primarily of invoices and cancelled checks pertaining to the expenses for which it now seeks indemnification. Four fact witnesses— a representative from each of the home builders—and an expert witness testified as part of the Plaintiffs' case. The Defendant introduced no evidence and offered no wit-

nesses, relying solely on cross-examination of Plaintiffs' witnesses. There then followed a period of post-trial briefing.

## III. Theory of Damages

Plaintiffs claim an assortment of direct and indirect costs associated with responding to the Compliance Advisories. Plaintiffs initially demonstrated the direct, out-of-pocket costs of the Compliance Advisories. These expenses were documented and organized into three categories: investigation, remediation, and other direct costs. The investigation and remediation costs derived from the requirements of the Compliance Advisories.

The "other direct costs" subcategory includes such items as compensated homeowner expenses and damages resulting from the compliance activities and delays associated with the Advisories. According to the Plaintiffs, they were forced to take certain measures in response to concerns and reactions of homeowners to the prospect of asbestos contamination on their property. These measures range from simple goodwill gestures such as dinner coupons, to enhancing landscaping and other aspects of the property during and after the investigation and remediation period. *See* Plaintiffs' Post–Trial Proposed Findings of Fact ("FOF") at ¶ 27. Finally, among the other direct costs, the Plaintiffs include the legal fees incurred in the compliance negotiations and in pursuing claims against the Defendant. FOF ¶ 26.

Plaintiffs also seek to recover *indirect* costs associated with construction and/or development delays, including unabsorbed overhead and unrecovered return on expenditures. FOF at ¶ 28. In the presentation of the evidence—in particular, the helpful thumbnail summaries found among Plaintiffs' demonstrative exhibits—this category of damages was labeled "other damages."

For this more controversial aspect of their claims, the Plaintiffs rely on the expert testimony of William Schwartzkopf, who applied familiar contract damages models such as the *Eichleay* formula in the real estate sales context. *See Eichleay Corp.*, ASBCA No. 5183, 60–2 B.C.A. ¶ 2688 (ASBCA 1960). We will examine Mr. Schwartzkopf's damages methodology in light of the evidence present-ed and the statutory purposes of Section 330's indemnification provisions.

In sum, Richmond American claims to have incurred total damages in the amount of $4,472,368, including the costs of investigation and sampling, costs of remediation, attorneys fees, homeowner expenses, unabsorbed overhead and historic indirect cost recovery. Metropolitan Development and Touchstone Homes claim $801,879, and $487,264, respectively. Standard Pacific claims to have incurred total damages of $3,294,095, based on the same theories of recovery.

Defendant has neither compensated the Plaintiffs nor assumed any responsibility for asbestos contamination on the Plaintiffs' property. Instead, the Defendant has made one of four general arguments at different stages of this litigation: (1) the Government is not obligated to pay all expenses incurred by the Plaintiffs for remediation to a non-detect level, as CDPHE demanded, because that demand was too extreme; (2) Plaintiffs have not provided specific documentation to support all costs reportedly incurred; (3) the Defendant is not liable for indirect costs associated with construction and/or development delays including unabsorbed overhead and unrecovered return on expenditures; and (4) Plaintiffs have not distinguished between attorneys fees incurred due to compliance with CDPHE advisories and those incurred from Section 330 litigation.

## DISCUSSION

### I. Standard of Proof

No precedent exists concerning damages under Section 330. As we have already found, Section 330 shifts the risk associated with the transfer of military property. To determine the scope of damages, therefore, we turn to the statutory language. Section 330(a)(1) provides:

> [T]he Secretary of Defense shall hold harmless, defend, and *indemnify in full* the persons and entities described in paragraph (2) *from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any*

*claim for personal injury or property damage* (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant as a result of [DoD] activities at any installation (or portion thereof) that is closed pursuant to a base closure law.

10 U.S.C. § 2687 note (emphasis added). We have determined that the Government thereby assumes responsibility for claims—those of the state of Colorado and those of private individuals—that result from the Government's contamination of the property. *See Liability op.* at 390 ("The protections of Section 330(a)(1) are sweeping ... by its own terms the statute is applied broadly, ...").

We agree with the Plaintiffs that, while not directly applicable, the standard of proof used by this Court in contract cases may serve as a useful measure in determining whether the Plaintiffs have met their burden at trial. Pl. Br. at 5. In that context a contractor must establish the quantum of its damages with reasonable certainty. *See Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002) ("sufficient basis exists for estimating the amount of lost profits with reasonable certainty"). However, in this case, we employ this standard not to estimate lost profits resulting from a breach of contract, but rather to determine whether straightforward and reliable evidence reflects the costs which have been incurred by each of the Plaintiffs as a result of the CDPHE Compliance Advisories.

As we describe below, the evidence presented by the builders enabled the Court "to make a fair and reasonable approximation of [their] damages." *Locke v. United States,* 151 Ct.Cl. 262, 267–68, 283 F.2d 521 (1960); *see also, Precision Pine & Timber, Inc. v. United States,* 63 Fed.Cl. 122, 131–32 (Fed. Cl.2004) (construing "reasonable certainty" standard). The Government, by contrast, relied totally on cross-examination to attack the credibility of the witnesses; it offered no affirmative evidence to counter Plaintiffs' testimony and exhibits.

## II.  Investigation and Remediation

■  Unlike the items we address later in connection with Mr. Schwartzkopf's expert testimony, there is no live dispute as to Plaintiffs' recovery of the direct costs of investigation and clean-up. We understand the Defendant's position that Section 330 was not intended to compensate Plaintiffs for this type of injury. However, we decided that issue against the Government in the summary judgment motions. As a legal matter, the Plaintiffs are entitled to these costs. The Government can avoid these damages only if the Plaintiff fails to provide a factual basis for their quantum.

### A.  *Richmond American Homes*

Richmond American, one of the larger companies involved in this suit, is a national production homebuilder. Tr. 30. The company's representative at trial was Ms. Gail Pickarts, National Director of Quality Assurance for Richmond American. *Id.* She oversees the quality assurance program for 22 Richmond American divisions in the United States. *Id.* at 31. During the applicable time frame in 2003, however, Ms. Pickarts was the Regional Director for Special Projects. *Id.* Her energies were dedicated exclusively to Richmond American's piece of the Lowry redevelopment project—the construction and sale of 63 homes in the Northwest Neighborhood. Specifically, Ms. Pickarts took a lead role in managing Richmond American's response to the ACM contamination found on the property. She was responsible for overseeing the company's compliance with Colorado's Compliance Advisories, as well as managing customer relations with respect to the occupied homes at Lowry. *Id.* at 40–41. Her authority extended to overall project management, to include managing the budget and selecting the various consultants and contractors used by the company. *Id.* at 41–43.

According to Ms. Pickarts, Richmond American expended $504,305 in investigative costs and $2,705,847 in remediation activities in response to the Compliance Advisories pertaining to the Northwest Neighborhood lots. The Defendant failed to rebut any of Richmond American's costs, choosing instead

to rely exclusively on cross-examination to undermine Ms. Pickarts' testimony. The Government was unsuccessful in these efforts.

Government counsel employed a similar cross-examination strategy with each of the builder representative witnesses, choosing to focus on the minutiae of the builders' transactions with those performing the consultation, inspection and remediation activities. For example, in its post-trial brief the Defendant points to Richmond Homes' failure to present a "master subcontractor agreement" or other evidence of the rates the company negotiated with the various vendors used throughout the investigation and remediation phases of the project. According to the Defendant, "[a]bsent the underlying contracts, there is a *complete failure of proof* with respect to vendor costs, as the Court cannot determine whether the amounts paid out by Richmond reflected its true obligations to the payees." *See* Def. Br. at 25 (emphasis added) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 61 Fed.Cl. 175, 179–81 (2004)).

Before addressing this characterization of the evidentiary record, it is important to note that pursuant to section 330, the Government had the option—one could argue, the obligation—to become intimately involved in the clean-up of ACM in the Northwest Neighborhood. *See Liability op.* at 390 ("[O]ur understanding of Section 330 recognizes the Government's 'obligation to help facilitate a safe and timely transfer of base property to other productive uses.'") (quoting 138 Cong. Rec. S13982–01 (daily ed. Sept. 19, 1992)). Air Force and DoD officials were implored by the Plaintiffs to intervene and defend against Colorado's Compliance Advisories, assist in negotiating appropriate testing and clean-up standards, and conduct the remediation. *Liability op.* at 383–84. Concerned only with the government-owned portions of Lowry, agency representatives chose to remain unresponsive despite the inevitability of an indemnification claim. *Id.*

Had the Air Force or Department of Defense become involved when first asked, the agencies could have overseen the project and used their own personnel or contractors of their choosing. At a minimum, they could have reviewed the proposals and bids of the various contractors used by each plaintiff prior to the submittal of the same to the CDPHE. The Government was well aware that the builders planned to seek indemnification for its expenditures. Given this context, the Defendant has only itself to blame for any costs it now deems excessive.

More importantly, however, the Government has not even attempted to show that costs were excessive. The Defendant rests instead on hyperbole that masks the reality of the situation. As part of the Section 330 claim process, the Air Force collected the documented expenses of each of the builders on behalf of the DoD; but the Secretary of Defense apparently never bothered to audit the expenses and ultimately declined to approve or disapprove the claim. *Liability op.* at 385. Likewise, during discovery in this case, the Government was free to examine all of these transactions and conduct necessary depositions to question certain charges. Finally, Government counsel examined all of the documents on Plaintiffs' exhibit list and stipulated to their admissibility. Tr. 37; Joint Procedural Stipulations, ¶ 1 (June 19, 2007).

At no point before, during or after trial did the Defendant actually challenge the reasonableness of one of these expenses, or point to an exorbitant labor rate charged by a particular contractor. Despite the numerous opportunities the Government had to challenge the Plaintiffs' costs, it preferred to lie in ambush until trial, asserting claimed weaknesses in Plaintiffs' cases by means of cross-examination. While the Government had a technical right to pursue this litigation strategy, it was not conducive to a reasonable resolution of this dispute.

We cannot disregard the multitude of documented payments made by Richmond Homes. The Government has not made even a *prima facie* allegation that the invoices were improperly paid or that the compensation schedule, itself, was erroneous. To the contrary, the Richmond Homes payment records appearing in six binders worth of exhibits appear to be in order. Pl.Ex. 3–8.

As a consequence of her intimate involvement with this entire project, Ms. Pickarts was extremely familiar with the extensive documentary record presented at trial. The contractors' rates were pre-authorized and invoices personally approved by her through a manual work order system. Tr. 71–73. As she explained during her testimony, invoices were not arbitrarily paid. Work orders were submitted, assigned one of six cost codes specially created for this project, and then paid only after they had been reviewed by Ms. Pickarts. Tr. 72–74; 87. Those few expenses which had been incurred prior to the establishment of the cost code scheme were carefully audited: Ms. Pickarts "personally reviewed each of [the] costs, determined that they were appropriate, first of all, appropriately cost coded, and then appropriate to the Lowry cleanup investigation and remediation." Tr. 77. Under the circumstances, we certainly do not view this witness' testimony and her familiarity with these exhibits as a "complete failure of proof with respect to vendor costs," to quote the Government's rhetoric. Def. Br. at 25. Quite the contrary.

At trial, the witness addressed each and every one of the subtotals appearing on the lengthy list of contractors with a role in at least one aspect of the investigation, remediation, or resulting repair work. Dem. Ex. C–1; Tr. 82–108. We pause to consider just a few of the larger line items on the Plaintiffs' demonstrative exhibit of direct costs.

The environmental consulting firm A.G. Wassenaar accounts for $348,723 of Richmond's investigation costs, including: $23,250 for environmental control, $225,291 for soil sampling, and $100,182 for indoor air sampling. Dem. Ex. C–1. This firm's services represented a large percentage of the total expenses in the remediation category of direct costs, as well, accounting for $500,874 in asbestos abatement costs.

Ms. Pickarts prefaced her testimony on the compliance activities by citing an example of why she chose to rely on the service of A.G. Wassenaar at the very first sign of trouble: they had a good reputation, Richmond Homes had a longstanding relationship with the company, and "that relationship included fee schedule transparency." Tr. 44. According to the witness:

> Their fee schedule was published with us. We knew exactly what their rates were for what particular services. It's actually made a part of our master subcontractor agreement with all our contractors.

*Id.* While the plaintiff relied upon A.G. Wassenaar early in the compliance period, additional environmental contractors were required due to the magnitude of the project and the need to quickly address contamination on the occupied lots. Accordingly, Ms. Pickarts accepted bids from three contractors: Custom Environmental Services; Hudspeth & Associates; and LVI Environmental. Tr. 55. Their proposals varied with the amount of soil contained within a lot, as determined by dividing the lots into grids. Each contractor operated on a fixed price-per-grid basis, and their proposals were examined by Ms. Pickarts, who ensured the costs were reasonable. *See e.g.,* Tr. 97 (discussing Hudspeth & Associates.)

The Court was very impressed with Ms. Pickarts' credibility, the first of five witnesses to testify in Plaintiffs' case-in-chief. It was readily apparent that Richmond Homes approached this undertaking knowing that it would later have to justify its costs and provide accurate documentation in either an indemnification context before the governmental agency or in litigation before the Court. Given the fact that neither the witness' credibility nor her professional ability was attacked by Government counsel, and further considering that the authenticity of the exhibits was never challenged, we find that Richmond Homes did everything in its power to secure a prompt and efficient cleanup at a reasonable cost.

We find that the Plaintiff has demonstrated its direct investigation and remediation costs of **$504,305** and **$2,705,847,** respectively. In a separate section of this Opinion we will address the $194,551 in "other direct costs."

### B. *Standard Pacific*

The next witness for the Plaintiffs was Mr. Robert Reid, representing the Colorado division of Standard Pacific, another large na-

tional home builder. Tr. 154. During the redevelopment of Lowry, Mr. Reid was a senior vice president for operations; his responsibilities included home construction, land development, warranty, and purchasing. Tr. 156. According to Mr. Reid, his company purchased a total of 80 finished lots and had already constructed single-family detached homes on all of its lots. Tr. 167.

When the Compliance Advisories were issued against the company, Mr. Reid turned to their geotechnical engineer, CTL/Thompson, to assist Standard Pacific with the environmental compliance issues posed by the advisories. Tr. 162–63; 166–69. CTL/Thompson had a reputable environmental department and the CDPHE was apparently familiar with its personnel. Tr. 166. Although Standard Pacific's properties were substantially complete, not all of the homes had been occupied at the time ACM was discovered. Tr. 167. Standard Pacific had built an entire block of homes that sat directly over the suspected source of the asbestos, a demolished hospital. Tr. 168–69;173; Dem. Ex. B. As a result, extensive sampling and remediation efforts were required before the Compliance Advisory could be lifted. The company's remaining construction was delayed for 15 months as a result of the work required by the Advisories. Tr. 198.

In a similar vein to Ms. Pickarts' testimony, Mr. Reid summarized the work performed on the lots. In all, Standard Pacific expended $692,837 in investigation and $1,210,730 in remediation. CTL/Thompson and Environmental Demolition, Inc. (EDI)—another contractor that reportedly met with the approval of the regulators—conducted the vast majority of the work. Tr. 170, 181–83, 187–88; Dem. Ex. D–1. The witness addressed each of the 22 contractors involved in its compliance activities. Tr. 181–92. As was Richmond American's representative, Mr. Reid was confident and capable in addressing the costs:

> This was my project. I was responsible for it. I had a couple people working for me, but I authorized the invoices and I kept a running tally. I worked with our accounting staff and our personnel to en-

sure that we were capturing the costs as they were incurred.

Tr. 178. Mr. Reid explained his methodology for segregating costs attributable to potential asbestos contamination. Tr. 178, 185.

During cross-examination, the Government focused first on two line item deductions appearing on Standard Pacific's demonstrative chart—$14,757 for CTL/Thompson and $77,699 for Tarco—made well after the original claim had been compiled. Dem. Ex. D–1. The witness admitted that he had initially included invoices for these amounts in the claims. Later, the Plaintiffs' expert determined that the costs had been erroneously included in the indemnification claim. Tr. 200–01. We are not entirely sure what to make of the Defendant's questioning. The witness made an error. The Plaintiffs' expert conducted an independent audit of some of these invoices as part of his services and the oversight was corrected.

After exploring this area, the Defendant's questioning shifted again to a piecemeal examination of certain charges and back-up documentation—unit pricing, time logs, or contractual agreements—for the respective invoices. *See generally,* Tr. 205–31. In certain instances, Mr. Reid was able to recall the facts surrounding the questioned invoice. However, even when he could not recall the specific reasons for approving a charge, he was able to refer to the methodology and safeguards under which he operated during the project. Charges related to asbestos abatement were contemporaneously catalogued into a separate job code. While back-up documentation was not maintained in Mr. Reid's cost accounting files, it was contemporaneously supplied and personally examined by Mr. Reid before he approved the invoices; Mr. Reid was on-site and coordinating with these contractors on a daily basis. Tr. 232.

We found the witness explanations to be persuasive, especially in light of the fact that CTL/Thompson, a company approved by the state, monitored the entire process. The Government's cross-examination did little more than underscore the magnitude of this project and demonstrate that the Air Force's participation at the time in question would have been critical. We were provided no

testimony on behalf of the Government, expert or otherwise, that the total cost of Standard Pacific's investigation and remediation project was out of line. We were persuaded by Mr. Reid's testimony.

Accordingly, we find that Standard Pacific is entitled to $692,837 in investigation and sampling costs, and $1,210,730 in remediation costs. Dem. Ex. D–1. The remaining line items, appearing under the category "other direct costs," pertain to certain homeowner expenses and attorneys fees. The total expenses in these categories amount to $184,246, a small amount relative to the remainder of the direct costs. We address these other costs in a separate section.

## C. *Metropolitan*

Metropolitan Development, a Denver-based homebuilder, claims $568,432 in direct expenses, the overwhelming majority of which were expended as part of the investigation and remediation process. Tr. 381; Dem. Ex. E–1. Metropolitan's witness, Mr. Brett Blank, the company's land development manager, testified on the second day of trial. Like the witnesses who came before him, Mr. Blank was extremely familiar with both the development project and the activities precipitated by the discovery of ACM on the developed property.

Metropolitan purchased 52 finished lots from the LRA in three filings during the June through December 2002 period. Tr. 355. According to Mr. Blank, Metropolitan operates on a pace in which the company commences construction on up to 12 homes at a time without sales contracts. Tr. 357. As sales picked up, the company would proceed with construction on the additional lots in the Lowry Northwest Neighborhood. *Id.* Based on sales activity in the region, Metropolitan anticipated all sales being complete by January 2004. *Id.* However, the company did not actually complete sales until July 2004, in part because of construction delays. *Id.* A formidable obstacle to both construction and sales was encountered in developing one of the filings as a direct result of the Compliance Advisories. According to Mr. Blank, construction was halted on Filing 15,

block 2, for 30 days during which asbestos testing was conducted. Tr. 357–58.

As the documentary evidence introduced through Mr. Blank shows, $378,997 was expended in investigative costs, including coordinating and planning the sampling required by the CDPHE. These services were provided exclusively by Metropolitan's environmental consultant, Terracon. Tr. 362–63; Dem. Ex. E–1.

Remediating the contamination, and rehabilitating the property afterward, accounted for $121,939 of Metropolitan's claim. Dem. Ex. E–1. The ACM remediation was performed by EDI, while other contractors performed various landscaping and construction services to repair the damage necessitated by the excavation of the lots. Tr. 364, 375; *see also,* Tr. 373 (Bemas Construction provided fill dirt); Tr. 374 (Carroll & Lange performed engineering and survey work); Tr. 375–77 (JV & M Landscaping watered down excavated areas per emissions control plan); Tr. 377–78 (United Rentals provided construction fencing for remediation sites); Dibo Excavation (backfilling after remediation completed).

The final $60,788 in direct costs are reflected as fees paid to the law firm of Isaacson–Rosenbaum. Tr. 378. For the reasons we discuss in the next section, we deny these amounts. However, we find that Metropolitan has proven its investigation and remediation costs with reasonable certainty.

The Defendant took the same tack in challenging these costs as it did with the evidence presented by Ms. Pickarts and Mr. Reid. Like those witnesses, Mr. Blank testified that he personally authorized each contract and processed every invoice. Tr. 370. Furthermore, Mr. Blank assisted in compiling the Section 330 claim for indemnification. Before including any expenditures in the claim, he verified that they were related to the Compliance Advisories and that they represented a reasonable amount for the work performed. Tr. 373.

The cross-examination revealed differences in the amounts claimed during the initial Section 330 claim and in the presently claimed amounts. Tr. 383–85. However,

these inconsistencies were explained at trial. In fact, on direct examination, Mr. Blank identified line item deductions in which routine contractor charges for development work not related to the compliance advisories were inadvertently included. Tr. 379–80; Dem. Ex. E–1, E–1.3.

The Government tested the adequacy of this builder's documentation, as it did with the prior Plaintiffs. For example, the Defendant pressed Mr. Blank for material supporting the invoices—material such as time sheets and unit prices. Tr. 386–87. Once again, we are not disturbed by the absence of these materials. The witness described a systematic approach in which he negotiated charges with contractors, reviewed invoices as they came in, and subsequently performed due diligence in order to segregate normal development and construction expenses from those costs associated with remedying the ACM contamination. Tr. 370–72, 389–91; *see, Sacramento Mun. Util. Dist. v. United States,* 70 Fed.Cl. 332, 366 (Fed.Cl.2006) (reasonable certainty standard met only for those costs accurately recorded and assigned particular cost categories). The Government's cross-examination, though revealing occasional minor inconsistencies, did nothing to undermine our overall confidence in Metropolitan's calculation of the direct costs of compliance. In sum, the Government's cross-examination did not impair the persuasiveness of Mr. Blank's testimony, which we found thoroughly credible.

Thus, we find that Metropolitan is entitled to $378,997 in investigative and sampling costs, and $121,939 in remediation costs.

### D. *Touchstone Homes*

The final fact witness to appear at trial was Mr. Daniel Mues, the general manager for Touchstone Homes. Touchstone Homes is a small builder of custom homes in Denver and its immediate vicinity. Tr. 392. The company had a much smaller stake in the Lowry redevelopment project than the other plaintiffs, having purchased only seven lots in December 2002. Tr. 393; Dem. Ex. B.

Touchstone planned to build duplexes on their lots. According to Mr. Mues, this type of project typically requires six months.

However, Touchstone's construction schedule was impacted by the discovery of ACM in the Northwest Neighborhood. Tr. 396. At the time Colorado authorities halted the work on the sites, the seven lots were in various stages of construction, ranging from initial excavation to completed framing. Tr. 397.

Mr. Mues' testimony followed the same pattern of his predecessors. He briefly summarized the work performed by the various consultants and contractors which had been engaged to coordinate and comply with the CDPHE-approved response plan. Most of the investigative work had been performed by CTL/Thomson, the same environmental consultant used by the other plaintiffs. The firm was already under subcontract as Touchstone's soil engineer, and had a long-standing relationship with the home builder. Tr. 398–99. Several other familiar contractors assisted in Touchstone's piece of the remediation project, including EDI and High Plains Excavating. Dem. Ex. F–1; *see generally,* Tr. at 399–406.

Although Touchstone had relatively few affected properties in comparison to the remaining plaintiffs, one of its lots was on Block 13, the site of the buried debris where the concentration of ACM was heaviest. Tr. 400–04, 414. The evidence showed a total of $77,955 expended for the grid-testing and sampling phase of the project. Tr. 403; Dem. Ex. F–1. Remediation activities, including preparation, demolition, surveying, excavation, and fencing, account for $291,962 of Touchstone's direct costs. Tr. 404; Dem. Ex. F–1. Similarly, an "other direct costs" entry for $1,744 paid to Xcel Energy for post-excavation gas and electric connections is compensable as a direct cost related to the compliance work plan. Tr. 405. The witness established to the satisfaction of the Court that Touchstone implemented a system for separating compliance costs from other costs of redevelopment. *See* Tr. at 401–03 (describing "Timberline system.") Notwithstanding the Government's unsuccessful efforts to attack Mr. Mues' credibility, we find his testimony persuasive and effective.

As for the final category of direct costs, we deny recovery for the $2,686 attributable to Porzak Browning's cost-reimbursement efforts. Tr. 405, 412–13; *see* Legal Fees, *infra*.

We, therefore, award Touchstone **$77,955** for sampling and investigation costs, and **$293,706** for remediation and related costs.

### III.   Other Direct Costs

#### A.   Homeowner Expenses

■  Included among the direct costs are certain expenses that were demanded by customer relations concerns as opposed to the CDPHE.  As we have discussed, the Plaintiffs' development plans were in various stages of completion.  In certain cases, home sales had already been completed and the companies were forced to alleviate the concerns of the occupants and compensate them for the effects of the sampling and remediation activity.  Moreover, the companies had to assuage the concerns of buyers anxiously waiting to close on their home purchase, or those desiring to rescind their contract.  The costs associated with keeping existing and future homeowners satisfied were detailed to varying degrees by each witness.  We find these expenditures reasonable and necessary, and the testimony supporting them to be convincingly reliable.

Richmond American claims $45,115 in homeowner "reimbursements or costs incurred [as] direct consequences of the Compliance Advisories." Tr. 104–05.  The items outlined by Ms. Pickarts ranged from property damaged by abatement procedures to the cost of pet boarding and other storage during periods in which outdoor areas were placed off-limits. Tr. 105–07.  Ms. Pickarts handled the expected self-help claims—as when homeowners contracted on their own for various repairs or service—on a case-by-case basis.  She requested an invoice, "verified it to be accurate and reasonable, then [she] reimbursed the homeowner for that cost." Tr. 95.

Mr. Reid from Standard Pacific described several instances in which homeowners insisted on using their own landscapers to replace the landscaping disturbed by the compliance project. Tr. 187.  With each of the work orders he investigated the pricing to ensure it was within reason, and then approved the work.  *Id.* Mr. Reid dealt with 27 Standard Pacific customers who had yet to close on their properties.  For these individuals he had an amendment to the sales contracts drawn up to address the ACM situation.  Mr. Reid acceded to the request of one of these families to reimburse them for the cost of having an attorney review the amendment. Tr. 193; *see,* Dem. Ex. D–1 (line item for $438 for Jack residence).

Another "customer relations" expense, which was scrutinized at trial, was Mr. Reid's authorization for $3,500 in gift certificates for a local restaurant.  As he explained at trial, he had his warranty manager give a $100 gift certificate to each occupant homeowner in the affected area.  The measure was intended to address the inconvenience associated with the remediation; in particular, families were directed to keep their windows closed and had to leave their homes while some of the work was performed. Tr. 195.  This form of compensation might not have resulted from a *formal* third party claim against Standard Pacific from the indemnification standpoint.  Yet we view these items as necessary expenses under the circumstances.  We agree with the witness that this gesture and other efforts to keep open the lines of communication with the homeowners likely mitigated against a much worse outcome and greater costs imposed on the Government for reimbursement—Standard Pacific did not lose any contracts in the Northwest Neighborhood.  *Id.* at 195–96.

Metropolitan incurred similar additional expenses.  According to demonstrative evidence used during Mr. Blank's testimony, the company accumulated $6,711 in "additional expenses."  To the extent these costs reflect extraneous repair work that was intended to bring the properties back to their original condition after the remediation activities, we approve these costs.  However, a close inspection of these line items reveals that $5,000 of the $6,711 total were legal fees paid to McKenna, Long & Aldridge for the firm's efforts in recovering costs from the Air Force. Tr. 380; Dem. Ex. E–1. We find that

the Plaintiff is entitled to the balance of $1,711. The remaining $5,000 is not appropriately included among Section 330 damages, as our discussion of legal fees, below, demonstrates.

Admittedly, the procedures for reimbursing homeowners for a few of these items were not very formalized. For example: A homeowner complained to Ms. Pickarts because his outdoor grill was stolen, and he blames the fact that the remediation project required the removal of his fence. Tr. 134. We do not fault Ms. Pickarts for trying within reason to accommodate these claims. At trial, Government counsel attempted to exploit the informality inherent in these remedial measures, and tried to cast the homeowner-builder transactions in a shroud of doubt. In so doing the Government again misperceives the basic thrust of the legislation under which these claims are compensable. These builders were dealing with potential financial disaster. Homeowners were understandably concerned, some even eager to rescind their contracts and walk away in light of the delay accompanied by this project. We agree with the Plaintiffs that the failure to respond positively to these homeowners complaints would have increased the Government's indemnification exposure.

We refer to our liability opinion and the discussion of Section 330's requirement of "claim." Here once again the Defendant's position would apparently require the Plaintiffs to allow an injury to escalate by inaction before it can be compensated under Section 330. The Government's position defies logic and common sense. On the other hand, we can find no evidence of Government bad faith, as the Plaintiffs suggest. This is an untested statute. The Defendant disagrees with our interpretation of Section 330's liability provisions and it has merely carried through with its exceedingly narrow construction of the Government's indemnity obligations at trial. The Government is not required to act reasonably—and it has not.

In summary, we award damages to reimburse the Plaintiffs for these homeowner-related direct costs as follows: Richmond American, **$45,115**; Metropolitan, **$1,711**; and Standard Pacific, **$3,938**. Touchstone's

other costs were limited to the $1,744 Xcel Energy invoice, which was more appropriately considered among the remediation costs. Pl.Ex. 18, Tab 79.

## B. Legal Fees

The Plaintiffs claim their legal fees as another aspect of direct costs, although the witnesses testified only briefly on these expenses. We are compelled to reject this claim.

Collectively, the Plaintiffs have claimed close to $400,000 in legal fees. From what we can gather from the testimony, these costs arose in one of two contexts: (1) the fees incurred as a result of hiring attorneys to assist the builders in responding to the Compliance Advisories and negotiating with CDPHE; or (2) legal fees associated with attempting to enforce the Government's obligations to defend and indemnify the builders. *See* FOF ¶ 26. For instance, witnesses also testified that certain law firms helped to secure the cooperation of the Air Force, prepared formal claims against the Air Force and DoD, or pursued other means to obtain indemnity. *See e.g.,* Reid at Tr. 194 (describing role of McKenna, Long & Aldridge). We note that the Plaintiffs have not differentiated between the two purposes. The latter category, of course, also includes costs of the present litigation.

■ In their opening brief, Plaintiffs contend that Section 330 authorizes their recovery of the full scope of legal fees incurred "both in responding to the [a]dvisories and in assessing and pursuing their legal rights for indemnity from the Defendant." Pl. Br. at 17. The Plaintiffs rely on several Federal court decisions applying state law, as well as one of this Court's decisions involving an entirely separate indemnification statute. *See Sweet v. United States,* 63 Fed.Cl. 591, 600–01 (2005) (providing for indemnification of costs incurred in defending claims for public liability under Price–Anderson Act). In response, the Government argues that the language of this statute does not support the award of attorneys fees incurred in pursuing the claims raised in this litigation. On this

issue we are persuaded by the Government's argument.

First, these fees are essentially litigation costs; they are the direct result not of the State Compliance Advisories but of the Defendant's denial of Plaintiffs' claims. In other words, these legal fees are not the type of response costs which we previously held should be covered by Section 330. Second, Section 330 does not explicitly or implicitly permit a claimant to be reimbursed for attorneys fees associated with the enforcement of its own provisions. The statute is aimed at fees incurred in responding to or defending against claims that arise as a result of environmental contamination. There are no fee-shifting provisions, such as those found under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2006). According to the Government, the existence of a remedy in EAJA necessarily deprives the Plaintiff of a similar remedy under the provisions of Section 330. We have to agree with that practical result, if not necessarily with that rationale.

■ Congressional waivers of sovereign immunity are strictly construed in favor of the United States and cannot be implied. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Therefore, in the absence of specific statutory authority, expenses incurred in litigation against the United States are not recoverable. *See Kania v. United States,* 227 Ct.Cl. 458, 466–67, 650 F.2d 264 (1981) (citations omitted); *Sweet,* 63 Fed.Cl. at 598–99 (distinguishing "American Rule"). The sole waiver of sovereign immunity for an award of attorneys fees in this context is the EAJA. Furthermore, EAJA applications are timely only after a judgment is final and unappealable. 28 U.S.C. § 2412(d)(1)(B). To the extent the Plaintiffs desire to recoup the legal fees incurred in pursuing these claims-both at the agency-level and before this Court—the proper vehicle might be a post-judgment EAJA application. *See id.,* at § 2412(d) (application for attorneys fees under EAJA filed within 30 days of a final judgment in the litigation for which the fees are sought); *Sweet,* 63 Fed.Cl. at 601–02 (finding EAJA claim premature).

■ By contrast, the Plaintiffs' need to hire attorneys specializing in environmental compliance to deal with Colorado's Compliance Advisories would be compensable under the broad category of out-of-pocket expenses permitted under the indemnification scheme. Section 330 was designed to remove disincentives to private development, such as protracted litigation by third parties. *Liability op.* at 390. Although we dismissed the assertion that a formal monetary claim is required to trigger Section 330's indemnity obligations—we found that CDPHE's Compliance Advisory qualified as a third-party claim, in any event. *Id.* at 391; *compare, AISLIC,* at 35–36 ("Claims for personal injury and property damage commonly and ordinarily entail legal demands for monetary damages.").

The agency threatened to seek an injunction and penalties up to $15,000 per day, in the event its Compliance Advisories were ignored. *See* Compliance Advisories, Pl.Ex. 20–21; *see also, Liability op.* at 392 (citing 6 Colo.Code Regs. § 1007–2–1.9.2(A) (2006)). The requirements of the Compliance Advisories were complex and required the builders to obtain technical consultants and legal counsel in order to effectively negotiate and implement appropriate measures to remedy the ACM problem and lift the State's stop work order. We view these legal consultation fees as equivalent to the technical and scientific consultations for which we have already granted compensation. The fact that they relate to legal aspects, as opposed to technical or scientific matters, does not, in our judgment, disqualify them.

With that said, what are we to do about those legal costs that should be indemnified under Section 330? It is Plaintiffs' burden to establish the entitlement and quantum of damages. For all of their efforts at categorizing the damages and providing the Court with a clear breakdown of most of the direct costs, none of the Plaintiffs segregated the attorney fees, either through witness testimony or in briefing. The documentary evidence—barely mentioned during the testimony—consists of invoices with varying degrees of generality as to the legal services rendered. *See generally,* Pl.Ex. 8, Tab 27; Pl.

Ex. 11, Tab 34; Pl.Ex. 17, Tabs 61–65; Pl. Ex. 18, Tab 78. Often there is no more than a cryptic billing reference such as "Lowry Asbestos." *See* Pl.Ex. 18, Tab 78. In other instances, the billing statements include myriad undifferentiated legal tasks over the course of a given period of time, with just one price stated for all of them. *See e.g.,* Pl.Ex. 11, Tab 34 at 448.

Ms. Pickarts admitted that she had not reviewed the attorneys fees. Tr. 112. She testified only generically about the services rendered. *See e.g.,* Pickarts, Tr. at 110–11 ("Those are legal fees for legal counsel to advise us as to how to comply with the advisories, negotiate with the CDPHE on our behalf, and attempt to engage the Air Force in the discussions as well as the investigation and remediation, and additionally, the limited purpose of additional investigation on liability and entitlement to recovery.") The other witnesses were similarly vague and described both compliance-related consultant/attorney fees, as well as attorney fees associated with securing assistance and/or reimbursement from the Air Force. *See* Reid, Tr. at 166, 169, 179–80, 193–94, 210–12; Blank, Tr. at 362, 378, 380; Mues, Tr. at 405, 412.

The unfortunate result of this failure to segregate compensable from noncompensable costs is the denial of the compensable damages. We cannot speculate as to what percentage of presumably recoverable compliance-related attorneys fees is included among Plaintiffs claims. *Cf. Indiana Mich. Power Co. v. United States,* 60 Fed.Cl. 639, 663–64 (2004) (Court unable to discern nonrecoverable litigation fees from other damages), *aff'd,* 422 F.3d 1369 (Fed.Cir.2005). The need to keep accurate records was especially important in this case because the parties were well aware of the claim—a portion of the claimed costs were incurred in perfecting the claim—at the time the costs began to accrue. *See Delco Elec. Corp. v. United States,* 17 Cl.Ct. 302, 321 (1989) (discussing need to segregate costs where feasible to do so, and where large claim is anticipated), *aff'd,* 909 F.2d 1495 (Fed.Cir.1990); *cf.* JOHN CIBINIC, JR., RALPH C. NASH. JR. & JAMES F. NAGLE, ADMINISTRATION OF GOVERNMENT CONTRACTS 701 (4th ed.2006) (and cases therein) (addressing responsibility to segregate contract work from extra work in proving amount of equitable adjustment).

## IV. Plaintiffs' "Other Damages": Markup and Unabsorbed Overhead

The Plaintiffs' case for damages included the expert testimony of Mr. William Schwartzkopf, who reviewed the Plaintiffs' documentation and analyzed the impact of the work stoppage and compliance obligations on the builders' overall operations and profitability. The Government sought to exclude Mr. Schwartzkopf's testimony prior to trial. Order (Apr. 20, 2007) (denying Defendant's Motion in Limine). The witness explained the nature of the Plaintiffs' alleged indirect costs at the outset of his testimony:

Well, the foundation was the costs that they would incur that are known as indirect costs as opposed to direct costs, the direct costs being the costs we've heard about for the last two days that are spent right on the project site. The indirect costs, which we've also heard about but not the amount, are the costs of administering and managing those costs.

We've had a series of witnesses here, all of whom were very significantly involved, but the direct cost data didn't have any cost for those people. It didn't have salaries or wages for the administration or the management or the procurement of that work. So my analysis was looking at both the allocability of those indirect costs and the unabsorbed overhead, the costs that the plaintiffs incurred when their work was suspended for an indefinite period of time as well as within the indirect cost recovery a component of profit for the risk that the plaintiffs have taken, the risks that contractors take when they undertake construction projects.

Tr. 420–21.

Mr. Schwartzkopf quantified these impacts for each individual plaintiff, with indirect cost breakdowns reflecting: (1) unabsorbed overhead, a product of the respective builders' daily overhead and the number of days of delay experienced as a result of the Compliance Advisories; and (2) a percentage historic indirect cost recovery on each direct cost

incurred. *See generally,* Dem. Ex. C–2–3; Dem. Ex. D–2–3; Dem. Ex. E–1–3; Dem. Ex. F–1–3. We grant the former claim, but reject the latter.

The Government posed three legal questions pertaining to these damages, each of which it answers in the negative: (1) Can Plaintiffs recover "markup," or lost profit, and unabsorbed overhead damages stemming from their statutory indemnification claim; (2) can Plaintiffs' expert testify as to these damages; and (3) is it appropriate to use the *Eichleay* formula to determine unabsorbed overhead damages. *See* Joint Proposed Conclusions of Law (June 19, 2007).

Our answers to these questions lie in a first-impression analysis of the damages available under a Section 330(a)(1) claim. We conclude that § 330 permits the recovery of unabsorbed overhead, just as it would permit recovery of any other cost incurred as a direct result of the remediation project. We see no distinction between these costs, other than the fact that contractor expenses are captured by invoices and work orders, whereas overhead expenses are captured by formula. We address overhead damages in greater detail in the sections that follow. We turn first to those damages alternatively referred to as "markup," "lost profit" or "historic indirect cost recovery."

### A. Historic Indirect Cost Recovery– Lost Profits

■ At trial, Mr. Schwartzkopf explained that his markup calculations reflect "an allocation of indirect costs to contract costs." Tr. 427. In furtherance of his theory, Mr. Schwartzkopf explained how he calculated this figure for each builder. First, he compared company-wide and Lowry-only revenue figures and cost of sales—including the direct costs associated with the remediation project—for the relevant period. The resulting ratio yields each company's percent markup on sales, alternatively referred to as the "indirect recovery rate." Mr. Schwartzkopf then applied that rate to the direct costs—both line-item and totals—which we have discussed at length. *See* Dem. Ex. C–1, D–1, E–1, and F–1. According to the witness, the product is the "historic indirect cost re-

covery" which can be attributed to the Plaintiffs' compliance activities. *See* Tr. at 425–27, 430 (Richmond American); 432–35; 439 (Standard Pacific); 436–38 (Metropolitan); 439–40 (Touchstone). The historic indirect cost recovery claimed by each Plaintiff is as follows: $1,008,813 for Richmond American; $825,939 for Standard Pacific; $183,206 for Metropolitan; and $74,758 for Touchstone. Dem. Ex. C–1, D–1, E–1 and F–1.

Mr. Schwartzkopf applied a level of conservatism in his calculations, opting to use the lower of the profit margins as between company-wide revenues and Lowry revenues. Tr. 440, 449. In most cases, the figure was significantly lower companywide. As Mr. Schwartzkopf explained, redevelopment at Lowry was a "hot project." For instance, damages for Richmond American were based on the 29.63 percent historic indirect cost recovery applicable to the company's overall operations, not the 53.82 percent that would apply if we looked at revenue and costs of sales at Lowry alone. Dem. Ex. C–2. Likewise, Mr. Schwartzkopf used a rate of 39.56 percent as opposed to 67.37 percent for Standard Pacific, and 19.97 percent, as opposed to 30.8 percent, for Touchstone. *See* Dem. Ex. D–2; F–2. Metropolitan provided the sole exception—in its case, the revenue versus costs of sales yielded a higher percentage company-wide (41.41 percent) than on the Lowry project (32.23 percent). Dem. Ex. E–2.

According to Mr. Schwartzkopf, the markup calculation is a common methodology, which "reflects an allocation of indirect costs to contract costs." *See* Tr. 427 (testifying that major texts, including *Nash & Cibinic,* addresses markup as the "percentage cost allocation method.") Mr. Schwartzkopf asserted that his analysis included within the indirect cost recovery "a component of profit for the risk that the Plaintiffs have taken." Tr. 421. Specifically, the methodology for the indirect cost recovery was

to determine what the historic gross profit margin for each of the Plaintiffs were for the period of time in which they were involved with this project and to determine what that indirect profit margin was for each of their companies using their corpo-

rate financial data that they supplied me, their cost of sales and their revenues, and what that percentage of indirect cost recovery was for each of the Plaintiffs.

Tr. 421–22. The Government did not deny this proposition, nor did it quarrel with the actual calculations performed by Plaintiffs' expert, except to the extent Defendant questioned certain of the underlying direct costs at trial.

Rather, the Defendant opposes markup damages on legal grounds, contending that indemnification under Section 330 does not allow for recovery of costs plus profit. Def. Br. at 21. The Plaintiffs were anxious to avoid the "lost profits" label, although Mr. Schwartzkopf routinely touched upon the profit/loss concept in his testimony. See Tr. 421, 428, 430 and 440.

The Plaintiffs explained that Mr. Schwartzkopf did not calculate lost profits for home sales in the Northwest Neighborhood. Instead, the markup rate captures costs that are associated with meeting the compliance advisory obligations—managing and administering the remediation project—which are not included among the out-of-pocket direct costs. See Tr. 420–21. "For every dollar diverted," the Plaintiffs argue, "each [builder] was compelled to forego the historic returns it has always received for direct expenditures in its primary business area, the residential homebuilding industry." Pl. Reply at 10.

In this instance, we agree with the Defendant. By whatever term they use to describe their theory, Plaintiffs essentially seek recoupment for lost profits. We do not believe the statutory indemnification scheme supports this type of relief. The lost profits damages model is a familiar creature of contract law. These expectancy damages are available in limited circumstances as a remedy for breach of contract in order to give the non-breaching party the "benefit of the bargain"—the profit it would have made on the contract had there been full performance. RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981); *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001).

Plaintiffs' evidence in support of historic indirect cost recovery falls into this remedy category. Indeed, the Plaintiffs approach this case of first impression with the assumption that the Court can borrow from the law of contracts. And yet the briefs made no effort to demonstrate that the traditional prerequisites for an award of lost profits in cases of breach of contract were satisfied either directly or by analogy. *See e.g., La Van v. United States*, 382 F.3d 1340, 1351 (Fed.Cir.2004) (Plaintiffs must demonstrate that: (1) the loss of profits was the proximate result of the breach; (2) the loss of profits was foreseeable; and (3) that the damages can be proven with reasonable certainty); *Wells Fargo Bank v. United States*, 88 F.3d 1012, 1022–23 (Fed.Cir.1996) (denying claims for loss of business opportunities), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997); *Rumsfeld v. Freedom N.Y., Inc.*, 329 F.3d 1320, 1333 (Fed.Cir.2003) (anticipated profits associated with future contracts too remote and uncertain) (citations omitted).

In his testimony before the Court, Mr. Schwartzkopf loosely invoked CIBINIC & NASH as authority for his methodology for determining historic indirect cost recovery. Tr. 427. His reliance is, however, misplaced. Although recovery of profit is customary in cases of equitable adjustment, the rationale for awarding these damages is peculiar to government contract law; if additional work is performed by a contractor "[w]ithout the payment of a profit ... the Government would be getting something for nothing and the contractor would not truly be made whole." *See* CIBINIC at 735–36 (quoting *New York Shipbuilding Co.*, ASBCA 16164, 76–2 BCA ¶ 11,979, *recons. denied*, 83–1 BCA ¶ 16,534, at 57,427). In change order scenario, for instance: "The changed work, in effect, constitutes a new procurement under which a contractor is entitled to profit." *Id.* at 745 (quoting *Allison Div., Gen. Motors Corp.*, ASBCA 9741, 65–2 BCA ¶ 9343 at 43,383).

Notwithstanding the legislative aim of Section 330 to remove disincentives to private development of former military bases, we cannot expand the remedies available to an

indemnitee beyond those contemplated by Congress. As we have found, Section 330 spares the transferee of military base property the burdens and risks associated with defending environmental suits or enforcement actions. *Liability Op.* at 395. However, the Plaintiff has failed to point to any authority which guarantees that the purchase of military base property will be profitable. As a matter of law, we will not extend what amounts to "benefit of the bargain" relief to the indemnification context.

## B. Unabsorbed Overhead

■ We do not, however, foreclose damages that are necessary to place Plaintiffs in the same position as they were prior to entering the contract. We find that the statute provides a remedy in cases such as this, where an environmental enforcement action stalls a development project. Accordingly, we believe that unabsorbed overhead damages are directly relevant to a claim for indemnification under section 330. These expenses are fundamentally different from the lost profits represented by the markup rate. The overhead expenses incurred by the builders during the period of suspension, investigation and remediation at Lowry were "cost[s] ... arising out of [Colorado's] claim for ... property damage", under our interpretation of the Compliance Advisories and Section 330. 10 U.S.C. § 2687 note. We conclude that an indemnitee can be compensated for unabsorbed overhead during these periods of delay.

The burden of establishing the quantum of damages with reasonable certainty remains that of the Plaintiffs. *See Energy Capital Corp.,* 302 F.3d at 1325 (preponderance of evidence standard applies). Even if we find no legal obstacle, there remains the task of applying Plaintiffs' theories to these facts. Plaintiffs use the *Eichleay* model in computing the damages, a concept borrowed from the procurement field. *See generally,* CIBINIC at 720–26 (addressing *Eichleay Corp.,* ASBCA 5183, 60–2 B.C.A. ¶ 2688, *recons. denied,* 61–1 BCA ¶ 2894). The Government objects. We agree with the Plaintiffs that the underlying *Eichleay* principles—among them that a party must mitigate the effects

of a suspension of work, and that the Government is not responsible for delay which it had no role in causing—can certainly be applied to determine the Plaintiffs' Section 330 damages.

### (i.) Requirements of Eichleay

Where contractors are forced into a "standby" status and cannot proceed with contract performance or commit their resources elsewhere, they may be compensated for their overhead costs. The "*Eichleay* formula," was first set forth by the Armed Services Board of Contract Appeals in *Eichleay Corp.,* 60–2 B.C.A. ¶ 2688, and has since been adopted by the courts. The requirements are as follows:

First, there must have been a government-caused delay of uncertain duration. The contractor must also show that the delay extended the original time for performance or that, even though the contract was finished within the required time period, the contractor incurred additional costs because he had planned to finish earlier. Finally, the contractor must have been on standby and unable to take on other work during the delay period.

*Nicon, Inc. v. United States,* 331 F.3d 878, 883 (Fed.Cir.2003) (internal citations omitted).

The model was developed to provide a remedy for contractors injured by unanticipated delay resulting in extended contract performance, specifically in the field of construction contracts. *C.B.C. Enterps., Inc. v. United States,* 978 F.2d 669, 672 (Fed.Cir. 1992); *but see Libby Corp.,* ASBCA No. 40,765, 96–1 BCA ¶ 28255 (*Eichleay* construction delay model extended to manufacturing contracts). Whatever the context, the *Eichleay* formula is a familiar way to calculate recovery for unabsorbed home office overhead. We test the Plaintiffs' evidence against the concepts underlying *Eichleay* damages.

### (ii.) Overhead

■ In determining the impact of the delays encountered as a result of the soil contamination and Compliance Advisories, Mr. Schwartzkopf first determined for each build-

er the overhead allocable to the Lowry project. As he explained at trial, this calculation involves factoring company-wide total revenues/overhead and the company's total revenue for the Lowry project. Tr. 428; Dem. Ex. C–3. The Lowry overhead is then divided by the projected performance days to calculate daily overhead costs. The "unabsorbed overhead" is the product of daily overhead and the number of days of delay. Tr. 428.

Under *Eichleay*, the Plaintiffs can recover only for work suspensions which are caused by the Government and which result in uncertain periods of delay. In government contracts, it is delay caused by the contracting party, the Government—for Section 330, it is delay caused by the Compliance Advisory. In arriving at the appropriate figures, Mr. Schwartzkopf applied his considerable experience in dealing with cases of contractor delay. Consistent with his testimony, we shall apply the *Eichleay* principles by analogy to determine the periods of delay for which Plaintiffs can presumably recover unabsorbed overhead. Tr. 423.

### (iii.) Proof of Delay

First and foremost, a claimant must establish that the delay is attributable to the Government. Plaintiff may not recover for periods of concurrent delay. *P.J. Dick, Inc. v. Principi*, 324 F.3d 1364, 1370 (Fed.Cir. 2003). In this case, we require the delay to be caused solely by the Compliance Advisory.

In April 2003, the State of Colorado issued two Compliance Advisories, one which required extensive sampling of the soil on the lots, and another which set forth requirements for indoor air testing in occupied homes. Pl.Ex. 20 and 21. The advisories prohibited any activities which could disturb the soil, bringing the Plaintiffs' construction of homes to a grinding and complete halt. The CDPHE posted work stoppage signs throughout the Northwest Neighborhood. Tr. 42. Normal operations were suspended during the investigation and subsequent remediation projects.

During the summary judgment proceedings, the Government challenged whether the formal work stoppage, or the investigation and abatement procedures agreed upon,

were mandatory. As we held then, the compliance advisory is not a mere "invitation to voluntary action." *Liability op.* at 393. The builders were not permitted to proceed with excavation and construction activities. Had they chosen to continue with the development plans, they faced stiff penalties and state attorney general intervention. *Id.; see also*, Pickarts, Tr. at 45 (describing four phases of discussions with CDPHE: emission's control plan, soil sampling requirements, indoor air sampling requirements, and abatement requirements on contaminated lots.)

Each witness provided testimony establishing the delays they experienced in completing and selling their home products as a direct result of the Compliance Advisories. *See* Pickarts, Tr. at 35–37 (Sept.2003–July 2004 for Filing 11; Apr.2004–Sept 2004 for Filing 15), 108; Reid, Tr. at 161 (stopped construction on Block 13), 197–99 (15–month delay); Blank, Tr. at 357–58 (Jan.2004–July 2004), 367–68 (CDPHE releases), 382 (schedule impacts); Mues, Tr. at 395–96 (lot-by-lot anticipated versus actual completion dates), 406; Tr. at 441–42 (adjustments for Touchstone duplexes). Evidence of these schedule impacts was then provided to Mr. Schwartzkopf who calculated individualized overhead figure for each plaintiff. *See* Tr. 435 ("the calculation methods and the methodology are identical for all four. They just use different numbers and obviously different days and different numbers of lots.").

The Defendant failed to rebut the testimony of the four fact witnesses on the period of delay experienced by their respective companies. Notably absent in the *Eichleay* context is any evidence offered by the Government attributing delay to other causes. We are, therefore, confident that Mr. Schwartzkopf's calculations based on those periods of delay are credible. *See* Tr. at 423 ("[F]or each of the Plaintiffs, I determined both what part of their project was suspended and for what period it was suspended and determined the allocable overhead from that.") For example, with respect to Richmond American, Mr. Schwartzkopf explained:

Now the lots were delayed by differing amounts. Eleven of them were delayed

for 153 days and four of them were delayed for 244 days, so I came up with a weighted average, which is shown at the bottom on the left side. The weighted average is for the 15 lots that were delayed. They were delayed an average of 177 days each. And I multiplied that 177 days by the $322.50 per day allocable to those 15 lots to get the $58,852 of unabsorbed overhead.

Tr. 429.

Likewise, with respect to Standard Pacific, Mr. Schwartzkopf reasoned:

Standard Pacific had an entire block that was stopped, so they had a much longer period of days that were shut down. Block 13 was 21.4 percent of the total sales, so we determined the overhead allocable to Lowry, determined the amount allocable to Block 13 by taking 21 percent of that, then determined the overhead per day by the number of days they were on the project of 1,340 and then multiplied that by the days they were delayed in completing those Block 13 houses of 458 days at the $830 per day daily rate, to come up with a $380,343 unabsorbed overhead.

Tr. 344. These examples illustrate a careful and conservative approach to determining specific periods of delay attributable to the Compliance Advisories. We conclude that Mr. Schwartzkopf gave credible testimony as to these aspects.

### (iv.) Standby and Critical Path Analysis

It is not enough simply to establish the cause and duration of suspension. The final element for *Eichleay* damages requires that the Plaintiffs remained on standby. In our context, what the Plaintiffs must show is that it was not practical that the claimed indirect costs could be absorbed by putting the Plaintiffs' Lowry resources to other employment. The Government may rebut the *prima facie* case under *Eichleay* by establishing, alternatively: (1) that it was not impractical for the party claiming overhead to obtain other work; or (2) that the inability to secure other work was not a result of the Government's delay. *West v. All State Boiler, Inc.,* 146 F.3d 1368, 1376 (Fed.Cir.1998); *Oak Envi-*

*ronmental Consultants, Inc. v. United States,* 77 Fed.Cl. 688, 696 (2007). The Government chose to stand on its cross-examination of Plaintiffs' witnesses rather than introduce any rebuttal evidence of its own. We were not persuaded by its efforts to undermine Plaintiffs' factual proof of *Eichleay* damages.

A party is on "standby" only where it is shown that "work on a project is suspended for a period of uncertain duration and the contractor can at any time be required to return to work immediately." *All State Boiler,* 146 F.3d at 1373; *Melka Marine, Inc. v. United States,* 187 F.3d 1370, 1376 (Fed.Cir. 1999). The basis for the requirement is that the contractor who cannot determine the duration of a suspension, cannot adequately prepare for the anticipated completion of his project. As a consequence, the contractor's resources are standing by—they cannot be reallocated towards another contract or used in the currently suspended contract. *Id.* On the other hand, if the delay is for a determined period of time the contractor cannot be said to be on standby. *Id.*

In the wake of the Compliance Advisories, the builders were most certainly in "standby" mode. The on-site responsibilities of the project managers and their staff doubled. After three months of meetings, studies, consultant evaluations, and negotiations, the CDPHE, the LRA and the Plaintiffs finally arrived at acceptable sampling and cleanup levels. The builders walked away from the meetings with CDPHE with a final response plan. Each knew essentially what had to be done before further construction could commence, and each came up with a strategy tailored to its unique circumstances.

But despite any comfort provided by an approved course of action, there was no telling when the Plaintiffs could resume their normal construction, and even less certainty when they would complete their home sales. Under the circumstances, a response plan does not equate to a finite period of delay. No one, including the Air Force, knew the magnitude and location of contamination. In accordance with the state-approved course of action, the builders embarked on a substantial investigation stage, requiring soil sam-

pling and indoor air quality readings. Those results would then confirm for them the extent to which they must excavate and backfill the lots.

The suspension of normal construction or development on any given lot would not be lifted until remediation was complete and the CDPHE gave the builder a "no further action" letter. Tr. 151–52. Then and only then could that home be completed and sold. According to Ms. Pickarts, these letters trickled in from September or October 2003 to June or July 2004, as the abatement process progressed on all 63 lots owned by Richmond American. Tr. 152–53. Under these circumstances, we find that the precise duration of delay was unknowable at the time the Compliance Advisories were issued.

Turning to the Plaintiffs' ability to take on other work using the suspended Lowry resources, we note that it is not required that the they cease all other normal business activities in order to satisfy the standby requirement. *All State Boiler*, 146 F.3d at 1376–77. In fact, the ability to perform other normal business activities is irrelevant in determining unabsorbed overhead expenses caused by a delay; the Plaintiffs are injured under this model if they are unable to reallocate the indirect costs to an alternative project, causing those costs to become unabsorbed. *Id.*

The Lowry development teams were unable to pick up stakes and move on to another project. Two of the four Plaintiffs are national homebuilding companies, having construction activities ongoing across the country. But their regional offices were committed to this project; company representatives had to remain committed to abating and developing the property in an expedient fashion. *See* Reid, Tr. at 197 (model home and sales office open and staffed; supervisors, warranty personnel kept on site).

Based on the evidence presented at trial, with one exception these Plaintiffs could not simply roll up their operations and divert the resources on-site at Lowry to other development projects. Each Plaintiff had a mix of occupied homes, homes pending closing, and empty lots to deal with on a continuing basis during the remediation project. Take for example, the flurry of activity Ms. Pickarts describes in "mobilizing" for the abatement phase of Richmond American's response. They had to remove existing residential fencing, landscaping improvements and personal belongings of the homeowners, install wind screens on each block, apply containment measures such as plastic on the first story window, install air monitoring and misting systems, and create haul roads. Tr. 56–57.

We can apply the "standby" concept to this set of facts. If we were to view each home construction project in Lowry as a separate contract, then we would require Plaintiffs to establish for each period of delay used in Mr. Schwartzkopf's calculations, that they could not start construction on one home while work was suspended on another. Or put another way, they were necessarily idle. On the other hand, Metropolitan had three separate blocks of home sites, only one of which was delayed significantly. Tr. 437. Mr. Schwartzkopf testified that Metropolitan was actually delayed 458 days, and yet he used 30 days in calculating unabsorbed overhead because "the Metropolitan people were quite emphatic that ... they were able to shift their people to another project, and their real effect was 30 days." Tr. 437. Clearly, Mr. Schwartzkopf examined and properly applied facts evidencing standby, as part of his calculation of *Eichleay* damages.

The Plaintiffs' fact witnesses described an intense period in which they had to comply with the CDPHE-approved response plan and get their home construction back on line. Our review of that testimony revealed the project leaders and construction crews remained fully occupied. While they were not building the homes, the supervisors and site managers were coordinating the remediation, restoring the properties, and keeping the buyers happy. They kept their sales offices open so prospective buyers would not fear development plans had been abandoned.

The Plaintiffs were eager to get their homes sales back on track, and made efforts to mitigate the effects of the delay. Richmond Homes, for example, used multiple contractors to that very end. Ms. Pickarts

explained her reasoning for this approach during her direct examination:

> [I]n the interest of cost and of efficiency and of timing, I thought it best to award one block each to the subcontractors. In looking at their bids, and then understanding the expertise of each of the subcontractors, I matched what was essentially the low bid for each block and the expertise of that subcontractor to one of the three blocks.
>
> In addition to that, as I said earlier, a lot of these lots were occupied, and in the interest of having this abatement move forward almost immediately on all blocks, if I used three separate contractors I could start on all three blocks basically at the same time.

Tr. 55. We are convinced, having listened carefully as the witnesses described the urgency of their efforts, that these Plaintiffs were indeed on "standby."

Finally, the Defendant argues that the witnesses did not track their delays by critical path analysis. Def. Proposed Concl. of Law, ¶ 4; *see also, Essex Electro Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1295 (Fed.Cir.2000); *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984). As is often the case in the construction contract setting, delays may be occasioned by a myriad of factors—all parties to the contract and Mother Nature often share the blame. As a result, critical path analysis emerged as the traditional method of proving what portion of the delay was caused by the Government for the applicable periods of overhead. *See Sauer, Inc. v. Danzig,* 224 F.3d 1340, 1348 (Fed.Cir.2000) (proof of *Eichleay* damages must exclude concurrent delays.).

In this case, however, responsibility for the delay is not at issue. There was no need for the plaintiffs to present testimony on the issue. We entered the trial phase with a clear ruling on the scope of liability. In line with our decision on liability, this case raises no question of contributory responsibility. *Liability op.* at 396–99. The delay for purposes of calculating *Eichleay* damages results from, and is dictated by, the Compliance Advisories. We share Mr. Schwartzkopf's view that because the duration and cause of the delay were obvious, critical path analysis was unnecessary. Tr. 452.

Accordingly, we conclude that the Plaintiffs have presented credible evidence of the amount of unabsorbed overhead they incurred. We, therefore, direct award of the unabsorbed overhead amounts derived by Mr. Schwartzkopf: Richmond American $58,852; Standard Pacific $380,343; Metropolitan $50,241; and Touchstone $38,160.

### *CONCLUSION*

With the exception of incurred legal fees, the Plaintiffs have established their direct costs with reasonable certainty. We have found each and every line item claimed by the Plaintiffs to be a necessary expense, incurred as a direct result of the asbestos contamination or the Compliance Advisories, and adequately established by documentary evidence, witness testimony, or both. The Government failed to demonstrate that the stipulated documentary record or the unrebutted witness testimony is unreliable. Furthermore, the Plaintiffs have established with reasonable certainty that they have incurred unabsorbed overhead costs, as established by the testimony of their expert witness, Mr. Schwartzkopf. Accordingly, **we find in favor of the Plaintiffs** and order judgment as follows.

**Richmond American Homes of Colorado, Inc.,** is entitled to judgment in the amount of **$3,314,119:**

| | |
|---|---|
| Investigation | $ 504,305 |
| Remediation | $2,705,847 |
| Additional Expenses (less attorneys fees) | $ 45,115 |
| Unabsorbed Overhead | $ 58,852 |

**Metropolitan Development IV, LLC/ Metropolitan Builders, Inc.,** is entitled to judgment in the amount of **$552,888:**

| | |
|---|---|
| Investigation | $ 378,997 |
| Remediation | $ 121,939 |
| Additional Expenses (less attorneys fees) | $ 1,711 |
| Unabsorbed Overhead | $ 50,241 |

**Standard Pacific of Colorado, Inc.,** is entitled to judgment in the amount of **$2,287,848:**

| | |
|---|---|
| Investigation | $ 692,837 |
| Remediation | $1,210,730 |
| Additional Expenses (less attorneys fees) | $ 3,938 |
| Unabsorbed Overhead | $ 380,343 |

Touchstone Homes, LLC, is entitled to judgment in the amount of $409,821:

| | |
|---|---|
| Investigation | $ 77,955 |
| Remediation | $ 291,962 |
| Additional Expenses (less attorneys fees) | $ 1,744 |
| Unabsorbed Overhead | $ 38,160 |

**Defendant's Motion for Reconsideration,** dated February 6, 2008, is **DENIED. IT IS SO ORDERED.**